UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

| | |
|---|---|
| STIFEL, NICOLAUS & COMPANY, INC., | Case No.: |
| Plaintiff, | **COMPLAINT**<br>**[DEMAND FOR JURY TRIAL]** |
| vs. | |
| SHIFT TECHNOLOGIES, INC., | |
| Defendant. | |

-------------------------------------------------------------X

Plaintiff Stifel, Nicolaus & Company, Inc. ("Stifel"), by and through its attorneys, Gordon & Rees, LLP, for and by this Complaint against defendant Shift Technologies, Inc. ("Shift") alleges as follows:

## INTRODUCTION

1. The dispute is a simple breach of contract, of which a single term is the focal point – "**sale**".

2. In February 2020, Stifel entered into a written contract with Shift for Stifel to provide financial services in connection with Shift's desire to raise capital, including a private placement, and/or enter into an M&A transaction in order for Shift to obtain much needed capital to fund business losses ("Engagement Letter").

3. As part of the Engagement Letter, Shift and Stifel agreed that Stifel would obtain a fee if there were a "sale of at least a majority of the outstanding shares of [Shift's] voting stock (whether by way of purchase, merger, exchange, or other similar business combination transaction involving [Shift])."

4. The term sale, as contemplated by the parties in section 6 of the Engagement Letter ("Section 6"), included a reverse merger with an already publicly traded special purpose acquisition company ("SPAC").

5. When Shift closed its merger with a SPAC (Insurance Acquisition Corp.) Stifel was immediately owed the agreed-upon fee.

6. Many sophisticated privately held companies simultaneously pursue multiple options to maximize and expedite the process of raising capital. Stifel, aware that Shift was pursuing other capital-raising options including mergers, acquisitions, and/or business combinations through Wells Fargo, negotiated with Shift to include terms in the Engagement Letter to ensure Stifel would be fairly compensated for its work.

7. When Shift closed its merger with a SPAC in October 2020, Stifel submitted an invoice to Shift to obtain the agreed-upon fee pursuant to the Engagement Letter.

8. Now, Shift refuses to pay the invoice, disingenuously claiming the merger with the SPAC is neither a sale nor a "business combination transaction" as provided in the Engagement Letter.

9. Stifel and Shift both were aware and intended for that contractual provision to apply to all types of capital raises and/or sales, including Shift's merger with a SPAC.

10. The terms of that provision were thoughtfully deliberated and the subject of arm's-length negotiations. Shift cannot now claim ignorance to avoid fulfilling its payment obligations under the Engagement Letter.

**THE PARTIES**

11. Stifel is a corporation incorporated under the laws of the state of Missouri with its principal place of business at 501 N. Broadway, St. Louis, Missouri.

12. Upon information and belief, Shift is a corporation incorporated under the laws of the state of California with its principal place of business at 2525 16th St., San Francisco, CA.

## JURISDICTION AND VENUE

13. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the sum in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states.

14. The Court also has subject-matter jurisdiction as Stifel executed the Engagement Letter in New York, NY.

15. The Court has personal jurisdiction over Stifel as it has offices and does business in the State of New York.

16. The Court has personal jurisdiction over Shift as it does business in the State of New York.

17. The Court also has personal jurisdiction over this action pursuant to NY § 302(a)(1), as well as the Engagement Letter, whereby the parties agreed to the Court's jurisdiction.

18. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) and the Engagement Letter.

## GOVERNING LAW

19. The Engagement Letter provides, in pertinent part, "THIS ENGAGEMENT LETTER WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS, AND MAY BE AMENDED, MODIFIED OR SUPPLEMENTED ONLY BY WRITTEN INSTRUMENT EXECUTED BY EACH OF THE PARTIES HERETO…" (Emphasis in original.)

## STATEMENT OF FACTS

20. In or around October 2019, Shift contacted Stifel expressing an urgent need for capital.

21. Stifel and Shift executives discussed many available options to raise capital for Shift, including raising capital through a private placement (*e.g.*, 144A or Reg. D offering) as well as *via* a merger with a SPAC.

22. In November 2019, Stifel and Shift also discussed the dual-track process of simultaneously pursuing both a Rule 144A offering and an M&A transaction, including a SPAC merger.

23. On November 18, 2019, Dan O'Neil, Shift's Head of Corporate Development, sent an email to Stifel indicating that George Arison, Shift co-founder and co-CEO, wanted "to position it to the board [a]s we are doing a dual-track between m/a and 144a…"

24. On November 19, 2019, Stifel employees had a video conference call with George Arison and Dan O'Neil, during which Stifel presented an in-depth analysis of SPACs, including Stifel's own SPAC transaction experience.

25. The November 19, 2019, presentation identified active United States SPACs looking for merger partners, including Insurance Acquisition, Corp ("IAC").

26. Following the November 2019 presentation, Stifel sent Shift additional materials comparing SPACs with other options for making Shift a publicly traded company.

27. Shift and Stifel entered into negotiations for an agreement whereby Stifel would act as the sole lead managing, book-running initial purchaser, and/or placement agent for Shift in connection with the proposed offering or private placement of equity or equity-linked securities of Shift.

28. Shift and Stifel engaged in negotiations as to the terms of the proposed engagement

with Stifel sending a draft *via* email to Shift on December 17, 2019. The email included the note that Stifel "ha[d] left out our intended fee on the M&A side (see red, in square brackets in clause 5). We'd appreciate an update on how you are thinking about things regarding the M&A track so we can start to hone in on fee parameters there."

29. The original draft engagement letter from Stifel included language that provided for a cash advisory fee to Stifel "equal to the greater of (a)$[XX] or (b) [YY]% of the gross advisory fee set forth in [Shift's] agreement with its primary M&A advisor, Wells Fargo."

30. Shift sent its edits and changes to the draft engagement letter on December 30, 2019, making significant changes to the subject language, including the removal of tying the fee to be paid to Stifel to Shift's Wells Fargo agreement. Additionally, Shift added language to the draft engagement letter to limit Stifel's ability to recover a "Success Fee…after the closing of a merger or business combination involving [Shift] that is not a Sale of [Shift]."

31. The parties exchanged at least six versions of the draft engagement letter *via* email throughout December 2019 and January 2020, including revising the language in Section 6, negotiating the percentage of Stifel's fee, and, in particular, removing the limiting language Shift had added.

32. The parties memorialized the agreed terms, without Shift's previously proposed language limiting Stifel's fee, through the signed Engagement Letter dated February 3, 2020.

33. Pursuant to the Engagement Letter, Stifel agreed to "identify qualified institutional buyers, accredited investors, and/or non-U.S. persons whom may be interested in purchasing" equity or equity-linked securities of Shift. Which Stifel did.

34. Stifel also agreed to review proposed transactions, assist Shift in determining appropriate structure and terms of proposed transactions, conduct examination of Shift documents

and records, interview Shift personnel, make necessary investigations deemed necessary, assist Shift with preparing Shift's offering and other marketing materials related to offering, perform financial analysis of Shift and compare with other companies in the industry, and render such other services connected with a proposed offering as may be agreed upon by Shift and Stifel. Which Stifel did.

35. In exchange for Stifel's performance, Shift agreed to pay a placement fee of 7% of gross proceeds received by Shift in an offering of Shift common stock and all reasonable and documented fees and expenses Stifel incurred in connection with such offering.

36. Relevant to the instant issue, Section 6 provides:

> In the event that either (i) the sale of at least a majority of the outstanding shares of [Shift]'s voting stock (whether by way of a purchase, merger, exchange, or other similar business combination transaction involving the Company) or (ii) the sale of all or substantially all of the assets owned by the Company or its controlled affiliates ((i) and (ii) together, a "Sale of the Company") is consummated by any party, whether as a result of a single or series of related transactions, during the term of Stifel's engagement hereunder or during, or within 12 months following the expiration or termination of the Engagement Term, and such Sale of the Company is consummated prior to the consummation of an Offering, then the Company will pay to Stifel, upon the consummation of the Sale of the Company, as consideration for its services hereunder, a cash advisory fee (the "M&A Fee" and together with any Placement Fee, but excluding a Private Fee, a "Success Fee") equal to 0.925% of Transaction Value (as hereinafter defined.)

The "Transaction Value" is defined as:

> (A)   in the case of the sale, exchange or purchase of [Shift]'s equity securities, the total consideration paid for such securities (including amounts paid to holders of options, warrants and convertible securities in consideration for such securities), plus the principal amount of all indebtedness for borrowed money (including, without limitation, any lending lease consummation of such sale, exchange or purchase assumed or repaid or extinguished by the purchaser in the Sale of the Company or remaining on the Company's balance sheet immediately following consummation of the Sale of Company, and
> ….
> If any portion of the aggregate consideration is paid in the form of securities (excluding all securities received by employees of the Company, in connection with their employment by any purchaser or acquirer), the value of such securities, for purposes of calculating the transaction fee, will be determined by applying the

6

> methodology or formula set forth in the definitive transaction agreement; provided that to the extent such definitive transaction agreement does not so provide, then such fee shall be determined based on the average of the last sales price for such securities on the five trading days ending five trading days prior to the date of the consummation of the transaction. If such securities do not have an existing public trading market, the value of the securities shall be the mutually agreed upon fair market value on the day prior to execution of the definitive agreement to effect the transaction.

Stifel required that the parties include Section 6 in the Engagement Letter to ensure Stifel would be duly compensated for work it performed in attempting to raise capital for Shift in the event the offering did not successfully move forward due to no fault of Stifel.

37. Shift expressly agreed to this provision.

38. Stifel was well aware Shift was simultaneously working with Wells Fargo to assist in finding a publicly traded SPAC or merger partner with which Shift would merge, as an alternative to pursuing a private capital or other form of capital raise.

39. On June 14, 2020, Dan O'Neil of Shift informed Stifel *via* email that Shift had signed a letter of intent with a SPAC and expected to sign a "definitive merger agreement with the SPAC in the beginning of July." The email also stated "I know you guys [Stifel] expressed a preference to push discussions about economics for a little while, but given our timeline and our need to understand economic implications for the merger agreement in a couple of weeks, I'd really appreciate if we could plan to include this as part of our chat this week."

40. In his June 14, 2020 email, Mr. O'Neil was attempting to renegotiate the M&A fee as contemplated by the Engagement Letter given the trigger event of the SPAC merger.

41. On July 4, 2020, Shift terminated the Engagement Letter *via* email, which had an effective date of July 14, 2020, as the Engagement Letter required at least 10 days' prior written notice.

7

42. Despite Shift's termination of the Engagement Letter, Section 10 of the Engagement Letter (which, due to a scrivener's error, shows as the second Section 2, on p.7 of the Engagement Letter) states that the "agreements in Sections 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 18, 19, and 20 hereof are binding agreements of [Shift] and its successors and assigns and shall survive any expiration or termination of this Engagement Letter…"

43. As quoted in paragraph 36 above, Section 6 of the Engagement Letter obligated Shift to pay Stifel an "M&A Fee" for any "Sale of the Company" "within 12 months following the expiration or termination of the Engagement Term…"

44. Prior to finalizing the merger, Shift and IAC filed a Form-8K with the Securities and Exchange Commission ("SEC") titled "Agreement and Plan of Merger by and among Insurance Acquisition, Corp., IAC Merger Sub, Inc., and Shift Technologies, Inc." dated June 29, 2020, which attached a copy of IAC's proposed Merger Agreement as an exhibit ("Merger Agreement"). In relevant part, Section 2.6 of the Merger Agreement provides:

> Effect of Merger. At the Effective Time, without any action on the part of Parent, Merger Sub, Shift, or the stockholders:
>
> Each of the Shift Common Shares issued and outstanding immediately prior to the Effective Time (except for Dissenting Shares, Treasury Shares and other shares to be canceled pursuant to Section 2.6(c)), shall by virtue of the Merger and upon the terms and subject to the conditions set forth in this Section 2.6 and throughout this Agreement, be canceled and automatically deemed for all purposes to represent the right to receive its allocable portion of the Merger Consideration as provided herein (including in the Ownership Allocation) and each of the Stockholders shall cease to have any other rights as a stockholder of Shift with respect thereto….
> ….
> (c) Each Shift Share owned by any Subsidiary of Shift and each Treasury Share shall automatically be canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

45. On September 24, 2020, IAC filed a publically available proxy statement/prospectus on form 424B3 with the SEC (the "Prospectus").

46. Page 1 of the Prospectus contains a letter from John Butler, IAC's President and CEO, in which he advises IAC shareholders that if "the Merger is completed, the stockholders of Shift, which we refer to as the Shift stockholders, will exchange [100% of] their shares of Shift common stock for shares of our Class A common stock, par value $0.0001 per share, which we refer to as common stock."

47. Page 16 of the Prospectus states: "Shift stockholders will exchange their shares of Shift common stock for shares of our common stock as consideration in the Merger."

48. Page 17 of the Prospectus sets forth the terms of the merger proposal, stating that the "Merger Agreement provides for the business combination of Shift and [IAC] pursuant to the merger of Merger Sub with and into Shift with Shift continuing as the surviving entity and a wholly owned subsidiary of [IAC]."

49. Page 17 of the Prospectus went on to state that in "the Merger, the Shift stockholders will exchange their shares of Shift common stock for shares of [IAC's] common stock."

50. Shift merged with the SPAC IAC on October 14, 2020.

51. Shift's merger with IAC on October 14, 2020 constituted a "Sale of the Company" as defined by Section 6 of the Engagement Letter.

52. After the Merger Agreement went into effect on October 14, 2020, Stifel remitted an invoice to Shift for fees and payment as provided in the Engagement Letter.

53. On October 15, 2020, Shift advised Stifel that it did not intend to pay the invoiced amount, or provide any compensation to Stifel despite the fee being due and owing under Section 6 of the Engagement Letter.

54. Shift referred all subsequent discussions on the matter to its in-house counsel.

55. On March 23, 2021, Shift and Stifel engaged in a mediation with the Honorable John P. DiBlasi, Ret., in an attempt to settle the issue without need of litigation. Despite Stifel's good-faith efforts, the mediation was unsuccessful.

## CLAIMS FOR RELIEF

### COUNT 1
### (Breach of Contract)

56. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

57. Stifel and Shift entered into a valid and binding contract – specifically, the Engagement Letter.

58. Stifel performed all of its obligations under the Engagement Letter, including any and all conditions precedent related to the fee Shift now owes.

59. Section 6 of the Engagement Letter requires Shift to pay Stifel a cash advisory fee of 0.925% of the sale price ("Transaction Value") upon the sale of at least a majority of the outstanding shares of Shift's voting stock during the term of Stifel's engagement.

60. The sale transaction occurred on October 14, 2020, which, as described in paragraphs 41-43 above, was during the term of Stifel's engagement.

61. Pursuant to Section 6 of the Engagement Letter, in the case of the sale, exchange, or purchase of Shift's equity securities, as occurred with the SPAC merger with IAC, the "Transaction Value" is the total consideration paid for such securities. Specifically, if "any portion of the aggregate consideration is paid in the form of securities (excluding all securities received by employees of [Shift] in connection with their employment by any purchaser or acquirer), the value of such securities, for purposes of calculating the transaction fee, will be determined by applying the methodology or formula set forth in the definitive transaction agreement."

62. According to the Merger Agreement, the consideration for the exchange and issuance of new shares was $448,456,659.00. Therefore, the Transaction Fee owed to Stifel is $4,148,224.00.

63. Stifel also incurred out-of-pocket expenses in the amount of $9,094.54.

64. Shift owed the Transaction Fee and out-of-pocket expenses to Stifel immediately upon effect of the Merger Agreement. Accordingly, Shift is indebted to Stifel, pursuant to the Engagement Letter, in the amount of $4,157,318.54.

65. Although Stifel has demanded payment, Shift has failed and refused to pay and thus has breached the Engagement Letter.

66. Stifel has been damaged by Shift's failure to pay.

## COUNT 2
### (Unjust Enrichment)

67. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

68. Before entering into the Engagement Letter, Shift requested, for Shift's benefit, that Stifel, at Stifel's expense, provide Shift with significant information and literature on the options for taking Shift public, including multiple conference calls exploring all options. Stifel in fact provided that information.

69. In addition, Shift promised to pay Stifel the Transaction Fee in the event that Shift did not pursue the type of funding Stifel was engaged to secure.

70. Shift has deliberately failed to pay the agreed-upon Transaction Fee and continues to contend that the merger with IAC was not contemplated by the Engagement Letter despite the substantial negotiations over its terms and the acknowledgment of the triggering of the Transaction Fee in email communications.

71. Shift utilized Stifel's research, contacts, analysis, literature, and information in order to secure a SPAC merger with IAC, but did not provide Stifel with any compensation whatsoever for Stifel's work and expenses.

72. Shift benefited from Stifel's efforts on securing funding by enabling Shift to pursue two funding options simultaneously, minimizing the time to secure the much-needed capital.

73. Under these circumstances, equity and fairness demand that Shift give restitution for its receipt of the benefits that Stifel conferred, in the amount of the reasonable value of the services.

74. The reasonable value of the services Stifel provided to Shift is an amount to be determined at trial.

75. Thus, Shift has been unjustly enriched and Stifel has been damaged by Shift's refusal to pay.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff STIFEL, NICOLAUS & COMPANY, INC. demands judgment against defendant SHIFT TECHNOLOGIES, INC.:

(A) Awarding Stifel an amount to be determined at trial, but no less than the sum of $4,157,318.54, plus interest at the legal rate from October 15, 2020;

(B) Awarding Stifel against Shift its reasonable costs and disbursements incurred in this action;

(C) Punitive damages with respect to the unjust enrichment claim; and

(D) Granting Stifel such other and further relief as the Court deems just and proper.

Dated: May 7, 2021

Respectfully Submitted,

GORDON & REES, LLP

By: /s/ *Kendra S. Canape*
    Kendra S. Canape
    Mark A. Beckman
    1 Battery Park Plaza, 28th Floor
    New York, NY 10004
    Tel: (212) 269-5500 / (949) 255-6982
    Fax: (212) 269-5505 / (949) 474-2060

    *Attorneys for Plaintiff*
    *Stifel, Nicolaus & Company, Inc.*