UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
STIFEL, NICOLAUS & COMPANY, INC.,

               Plaintiff,

       - against -

                           **MEMORANDUM AND ORDER**

SHIFT TECHNOLOGIES, INC.,           21 Civ. 4135 (NRB)

               Defendant.
----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This lawsuit turns on the meaning of a single word, "sale," as it appears in a contract between plaintiff Stifel, Nicolaus & Company, Inc. ("Stifel") and defendant Shift Technologies, Inc. ("Shift").  Presently before the Court is the defendant's motion to dismiss.  For the following reasons, the motion is granted.

**I.  Background**

    **A.  Factual Background[1]**

        **1.  <u>Initial Discussions of Options for Shift's Capital Raise</u>**

In or around October 2019, Shift contacted Stifel to discuss a potential urgent capital raise.  Compl. ¶ 20.  Stifel and Shift discussed various options, including raising capital through a private placement, such as a placement pursuant to Rule 144A of

---

[1]    The following facts are drawn from plaintiff's complaint, ECF No. 1, filed May 7, 2021 ("Compl."), and where noted, from documents incorporated by reference therein.  On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  <u>Kaplan v. Lebanese Canadian Bank, SAL</u>, 999 F.3d 842, 854 (2d Cir. 2021).

the U.S. Securities Act of 1933, and/or through a merger with a Special Purpose Acquisition Company ("SPAC"). Id. ¶¶ 21-22. In November 2019, Shift indicated to Stifel that it was interested in pursuing a "dual-track" process of exploring both raising capital through a merger and through a potential private placement. Id. ¶ 23. Subsequently, on November 19, 2019, Stifel presented an analysis of potential options for a capital raise, which included an extensive description of its experience with SPACs. Id. ¶ 24; ECF No. 23-1 ("Ex. A"). That presentation also specifically contrasted the benefits and drawbacks of SPACs with other options: an initial public offering ("IPO"), a merger, or a sale. See ECF No. 23-1 at 16-17.[2] Subsequently, the parties began memorializing the terms of an agreement whereby Stifel would act "as the sole lead managing, book-running initial purchaser, and/or placement agent for Shift in connection with the proposed offering or private placement of equity or equity-linked securities of Shift." Compl. ¶ 27. Shift simultaneously explored options for a merger and acquisition transaction advised by Wells Fargo, including finding a publicly traded SPAC or merger partner. Id. ¶¶ 29-30, 38.

---

[2] The Court finds that the presentation is incorporated by reference into the complaint. For a document to be incorporated by reference, "the complaint must make 'a clear, definite and substantial reference to the documents.'" DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003)). Here, the complaint makes a "clear, definite, and substantial reference" to the presentation by discussing the fact of the presentation and its contents. See Compl. ¶¶ 24-25.

**2.   The Engagement Letter**

Throughout December of 2019 and January of 2020, Shift and Stifel extensively negotiated the terms by which Stifel would provide services to Shift, exchanging at least six versions of an engagement letter before formally signing a final agreement on February 3, 2020 (the "Engagement Letter").   Id. ¶ 31.   These negotiations in part involved the advisory fee that Stifel would receive in the event that Shift elected to enter into a merger and acquisition with Wells Fargo, rather than an offering or private placement with Stifel.   Id. ¶¶ 28-30.   In fact, on December 5, 2019, Stifel proposed a cash advisory fee "equal to the greater of (a) $[XX] or (b) [YY]% of the gross advisory fee set forth in [Shift's] agreement with its primary M&A advisor, Wells Fargo." Id. ¶ 29.   Ultimately, that language was rejected, and the parties agreed on the following language:

> In the event that either (i) the sale of at least a
> majority of the outstanding shares of [Shift]'s voting
> stock (whether by way of a purchase, merger, exchange,
> or other similar business combination transaction
> involving the Company) or (ii) the sale of all or
> substantially all of the assets owned by the Company or
> its controlled affiliates ((i) and (ii) together, a
> "Sale of the Company") is consummated by any party,
> whether as a result of a single or series of related
> transactions, during the term of Stifel's engagement
> hereunder or during, or within 12 months following the
> expiration or termination of the Engagement Term, and
> such Sale of the Company is consummated prior to the
> consummation of an Offering, then the Company will pay
> to Stifel, upon the consummation of the Sale of the
> Company, as consideration for its services hereunder, a
> cash advisory fee (the "M&A Fee" and together with any

Placement Fee, but excluding a Private Fee, a "Success Fee") equal to 0.925% of Transaction Value (as hereinafter defined).

Id. ¶ 36.  The "Transaction Value" is in turn defined as:

(A) in the case of the sale, exchange or purchase of [Shift]'s equity securities, the total consideration paid for such securities (including amounts paid to holders of options, warrants and convertible securities in consideration for such securities), plus the principal amount of all indebtedness for borrowed money (including, without limitation, any lending lease consummation of such sale, exchange or purchase assumed or repaid or extinguished by the purchaser in the Sale of the Company or remaining on the Company's balance sheet immediately following consummation of the Sale of Company, and
....
If any portion of the aggregate consideration is paid in the form of securities (excluding all securities received by employees of the Company, in connection with their employment by any purchaser or acquirer), the value of such securities, for purposes of calculating the transaction fee, will be determined by applying the methodology or formula set forth in the definitive transaction agreement; provided that to the extent such definitive transaction agreement does not so provide, then such fee shall be determined based on the average of the last sales price for such securities on the five trading days ending five trading days prior to the date of the consummation of the transaction. If such securities do not have an existing public trading market, the value of the securities shall be the mutually agreed upon fair market value on the day prior to execution of the definitive agreement to effect the transaction.

Id.

### 3.  The SPAC Transaction

On June 14, 2020, Shift informed Stifel that it had signed a letter of intent with a SPAC and expected to sign a definitive

merger agreement with the SPAC in July.  Id. ¶ 39.  Shift's Head
of Corporate Development also informed Stifel that "I know you
guys [Stifel] expressed a preference to push discussions about
economics for a little while, but given our timeline and our need
to understand economic implications for the merger agreement in a
couple of weeks, I'd really appreciate if we could plan to include
this as part of our chat this week."  Id.  On July 4, 2020, Shift
terminated the Engagement Letter, with an effective date of July
14, 2020.  Id. ¶ 41.  On October 14, 2020, Shift entered into a
SPAC merger with Insurance Acquisition, Corp. and its subsidiary,
IAC Merger Sub, Inc. ("Merger Sub").  Id. ¶ 44.  The merger
agreement specified that:

> Effect of Merger. At the Effective Time, without any
> action on the part of Parent, Merger Sub, Shift, or the
> stockholders:
>
> Each of the Shift Common Shares issued and outstanding
> immediately prior to the Effective Time (except for
> Dissenting Shares, Treasury Shares and other shares to
> be canceled pursuant to Section 2.6(c)), shall by virtue
> of the Merger and upon the terms and subject to the
> conditions set forth in this Section 2.6 and throughout
> this Agreement, be canceled and automatically deemed for
> all purposes to represent the right to receive its
> allocable portion of the Merger Consideration as
> provided herein (including in the Ownership Allocation)
> and each of the Stockholders shall cease to have any
> other rights as a stockholder of Shift with respect
> thereto....
>
> ....
> (c) Each Shift Share owned by any Subsidiary of Shift
> and each Treasury Share shall automatically be canceled

and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

Id. After the merger took effect, Stifel sent Shift an invoice for the advisory fee purportedly owed to Stifel under the terms of the Engagement Letter. Id. ¶ 52. Shift subsequently informed Stifel on October 15, 2020 that it did not intend to pay the invoiced amount. Id. ¶ 53.

## B. Procedural History

On May 7, 2021, Stifel commenced this action, bringing claims against Shift for breach of contract and unjust enrichment. ECF No. 1. On July 7, 2021, Shift filed a letter requesting a pre-motion conference in advance of its proposed motion to dismiss, pursuant to this Court's Individual Practices. ECF No. 17. Stifel replied to this letter on July 12, 2021. ECF No. 18. On July 15, 2021, this Court determined that Shift could bring its motion without the necessity of a pre-motion conference and gave Stifel leave to amend its complaint. ECF No. 19. No amendment was made. Subsequently, on September 13, 2021, Shift filed its motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 22. Stifel filed its opposition to the motion on October 19, 2021, ECF No. 27, and the motion was fully briefed as of November 2, 2021, ECF No. 29. This Court held oral argument on July 19, 2022.

## II.  Legal Standard

### A. Federal Rule of Civil Procedure 12(b)(6)

To withstand a Rule 12(b)(6) motion, the non-movant's pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [pleaded] fact[s] . . . allow[] the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." Id. While the Court accepts the truth of the pleaded facts, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

### B. Contract Interpretation

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use," and thus the court "ordinarily looks only at the wording used by the drafters who presumably understood what they intended." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 426, 428 (2d Cir. 1992) (citing Slatt v. Slatt, 64 N.Y.2d 966 (1985)). "It is axiomatic that where the language of a contract is unambiguous, the parties'

intent is determined within the four corners of the contract, without reference to external evidence." Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1210 (2d Cir. 2002) (citing United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991)).

Ambiguous language is language which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usages and terminology as generally understood in the particular trade or business." Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987) (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y.1968)). Conversely, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations," or "where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'" Seiden Assocs, 959 F.2d at 428 (quoting Bethlehem Steel Co. v. Turner Construction Co., 2 N.Y.2d 456, 459 (N.Y. 1957)).

## III. Discussion

Both parties agree that this lawsuit turns on the meaning of "sale," as the term is used in the Engagement Letter. Defendant contends that "sale" should be given its dictionary definition of "[t]he transfer of property or title for a price." SALE, Black's Law Dictionary (11th ed. 2019). Defendant argues that under that

definition, Shift's SPAC transaction does not constitute a "sale." In response, plaintiff makes a series of alternative arguments: (1) the Engagement Letter defines sale to be more expansive than the dictionary definition plaintiff advances, (2) that sale should be given the broader meaning it holds under the Securities and Exchange Act of 1934 (hereinafter, the "Exchange Act"), as opposed to the dictionary definition applicable under New York law, and (3) that the SPAC transaction is in fact a sale, even under the dictionary definition.  We address each argument in turn.

### A. The Engagement Letter Does Not Provide a Definition of "Sale"

In interpreting a contract, the Court's first recourse is the plain meaning of the words in the text.  We interpret contracts on the principle that "words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions."  Orchard Hill Master Fund, Ltd. v. SBA Comm's Corp., 830 F.3d 152, 157 (2d Cir. 2016).

Here, the text is clear.  The Engagement Letter provides in relevant part that Stifel will be paid a fee:

> In the event that either (i) the sale of at least a majority of the outstanding shares of the Company's voting stock (whether by way of a purchase, merger, exchange, or other business combination transaction involving the Company) or (ii) the sale of all or substantially all of the assets owned by Company or its controlled affiliates ((i) and (ii) together, a "Sale of the Company") is consummated with any party . . . .

ECF No. 23-2, ("Ex. B") at 4-5.  Simply put, for Stifel to be paid, a sale of the majority of the outstanding voting stock or substantially all the assets of Shift must occur.  Stifel argues that the phrase "whether by way of a purchase, merger, exchange, or other business combination transaction" acts to define sale, so that in context, "sale" means any "purchase, merger, exchange, or other business combination transaction" that in any way involves the majority of the outstanding shares of the Company voting stock. Such an interpretation is strained and contrary to the plain English reading.

First, the natural reading of the provision is that the contents of the parentheses are examples of types of transactions through which the Company's voting stock may be sold.  As the Supreme Court has observed, "[t]he use of parentheses emphasizes the fact that that which is within is meant simply to be illustrative." Chickasaw Nation v. United States, 534 U.S. 84, 89 (2001).  The inclusion of examples does not expunge the requirement that a sale of the majority of the voting shares of Shift must occur in order for Stifel to be paid.  See Westview Assocs. v. Guar. Nat. Ins. Co., 95 N.Y.2d 334, 339 (N.Y. 2000) (noting that in interpreting contracts under New York law, "surplusage [is] a result to be avoided").  Crediting plaintiff's argument would render the language that provides that Stifel shall only be paid a fee if a "sale of at least a majority of the outstanding shares

of the Company's voting stock" mere surplusage, in effect overwriting the language outside the parentheses (that a sale of the majority of the Company's shares must occur) with the language inside the parentheses (which describes various means by which the sale may take place).

Second, while plaintiff contends that the contents of the parenthetical beginning "whether by" define the term "sale," the Engagement Letter uses a specific construction when it defines terms and does not use that construction here.  When defining terms, the Engagement Letter places the defined term in quotation marks, as is typical in legal contracts, to indicate a specific meaning is being given to a term.  See, e.g., Ex. B at 5 ("a cash advisory fee (the 'M&A Fee' and together with any Placement Fee . . .").  Since that construction is not employed here, there is no reason to assume that the contents of the parentheses define the term "sale."

### B.  The Dictionary Definition of "Sale" Applies

Since the contract does not define sale, we must resolve the parties' differing positions on its meaning.  Defendant suggests that the ordinary definition of sale applies, pursuant to New York law.  Plaintiff suggests that the Exchange Act's definition applies instead.

It is clear that New York law applies.  In fact, the Engagement Letter choice of law clause clearly states that "THIS

ENGAGEMENT LETTER WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK . . . ." Ex. B at 11 (emphasis in original). Under New York law, it is a "basic premise[] that courts will generally enforce choice-of-law clauses[.]" Ministers & Missionaries Benefit Bd. v. Snow, 26 N.Y.3d 466, 470 (N.Y. 2015). Plaintiff has provided no reason to disturb this rule.

Under New York law, we apply the "ordinary meaning" of sale, which is "the transfer of property or title for money or other consideration." Anthracite Cap., Inc. v. MP-555 W. Fifth Mezzanine, LLC, No. 03 Civ. 5219 (DLC), 2005 WL 1155418, at *7 (S.D.N.Y. May 17, 2005), aff'd, 165 F. App'x 875 (2d Cir. 2005) (citation omitted); see also SALE, Black's Law Dictionary (11th ed. 2019) (defining "sale" as "[t]he transfer of property or title for a price:"); TRANSFER, Black's Law Dictionary (11th ed. 2019) (defining "transfer" as "disposing of or parting with" an asset or "convey[ing] property or title from one person to another").

In contravention of the choice of law clause, plaintiff claims that "sale" should be given its meaning in the Exchange Act because this contract relates to the sale of securities. This argument fundamentally misunderstands both the Exchange Act and basic contract law. The Exchange Act regulates "purchase-and-sale transactions" of securities, and "it is parties or prospective parties to those transactions that the statute seeks to protec[t]."

Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 267 (2010)
(citations and quotation marks omitted) (alteration in original).
The Engagement Letter is not a contract for the purchase-and-sale
of securities, but instead is a services contract.  Specifically,
it governs the manner and conditions in which Stifel will act "as
the sole lead managing, book-running initial purchaser and/or
placement agent for Shift."  Ex. B. at 1.   It sets forth the
duties the parties have and the services that Stifel shall provide,
including, inter alia, "(i) Reviewing the proposed transaction;
(ii) Assisting the Company in determining the appropriate
structure and terms of the proposed transaction, (iii) Conducting
an examination of documents and records . . . ."  Id. at 2.  As
such, the more expansive definition of "sale" used in interpreting
the Exchange Act has no bearing here.

Tellingly, plaintiff cites no case law in support of its
suggestion that the more expansive definition of "sale" in the
Exchange Act should be imported into the contract.  Nor can it, as
courts routinely apply New York law to interpret contracts between
a company and its financial advisor relating to the sale of
securities.  See, e.g., Crowley v. VisionMaker, LLC, 512 F. Supp.
2d 144, 152 (S.D.N.Y. 2007) (applying New York law in dispute over
whether plaintiff was entitled to "final advisory fee," which would
be paid in the event of the "offer and sale" of certain equity
securities);  MillerTabak + Co., LLC v. Senetek PLC, 118 A.D.3d

520, 521-22 (1st Dep't 2014) (applying New York law, not federal securities law, to determine whether the attempted purchase of certain notes was a sale or disposition of securities sufficient to earn a financial advisor a transaction fee).[3]

### C.  The SPAC Transaction Was Not a Sale

Having determined that "sale" involves a transfer of ownership, we consider plaintiff's argument that even under this definition the SPAC transaction constituted a sale.  The SPAC transaction does not meet the definition of sale because under the terms of the transaction, no shares of the original Shift company were ever transferred.  Instead, the shares of the original Shift company were "canceled and automatically deemed for all purposes to represent the right to receive its allocable portion of the Merger Consideration. . . ." ECF No. 23-3, ("Ex. C") at 17 (Section 2.6(a)).  In other words, the shares of Shift were not transferred to new owners but were "canceled," and the existing owners were given rights to shares of the new company.  This is not a sale.  A sale, as explained above, requires a change in ownership.  See, e.g., New York Tile Wholesale Corp. v. Thomas Fatato Realty Corp., 787 N.Y.S.2d 341, 343 (2d Dep't 2004) (holding of transfer of

---

[3]     To the extent that plaintiff is arguing that the Exchange Act should inform how this Court interprets sale because Stifel's own contract is ambiguous, that is an argument the Court rejects.  Moreover, even if the contract were ambiguous, Stifel has provided no persuasive reason why the Exchange Act would control when courts ordinarily look to New York law to construe advisory contracts such as this.

property from "Fatato to Garden, an entity in which Fatato indirectly held a 60% membership interest" was "not the equivalent of an outright 'sale' of the property to a third party in an arm's length transaction, since Fatato, both before and after the restructuring, maintained either ownership of, or a controlling interest in, the property."); Intrepid Invs., LLC v. Selling Source, LLC, 165 A.D. 3d 523, 525 (1st Dep't 2018) (holding that a "reverse merger" with a SPAC was "not necessarily" a sale because the the majority shareholders of the original entity retained a majority of the stock of the surviving entity). Similarly here, Shift's stockholders owned a majority of Shift before the SPAC transaction, and a majority of the surviving entity. Since the stockholders in Shift owned a majority of the voting stock in Shift both before and after the SPAC transaction, the SPAC transaction is not a sale.

Our conclusion that a SPAC transaction is not in fact a sale is reinforced by Stifel's own November 2019 presentation, in which Stifel explicitly contrasted a SPAC transaction with, in one instance, an IPO and a sale, and in another, a merger and acquisition, and a sale. See Ex. A at 16-17. The presentation makes clear that during the time that Stifel was negotiating this contract, Stifel was aware of SPAC transactions and understood a SPAC transaction to be an alternative to a sale of stock, offering, or placement, or merger and acquisition. Stifel's appreciation of

the distinction between a SPAC transaction and a sale highlights Stifel's failure to include a provision in the Engagement Letter for a fee in the event of SPAC transaction.

**D. Unjust Enrichment**

Plaintiff also makes a claim for unjust enrichment. But "[n]umerous decisions applying New York law have held that an unjust enrichment claim is barred if there is a valid contract governing the subject matter of the dispute[.]" Mueller v. Michael Janssen Gallery Pte. Ltd., 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) (internal quotation marks and citation omitted) (collecting cases). Here, there is no question that the Engagement Letter applies to govern the subject matter of the dispute, as it specifies the terms of how, and whether, Stifel would get paid an advisory fee. As such, the unjust enrichment claim is barred by the existence of a contract.

Moreover, any argument that a party was unjustly enriched here is misguided. This agreement is a heavily negotiated contract between two sophisticated parties. Further, Stifel knew that it was operating on a "dual-track" with Wells Fargo to advise Shift on a potential transaction, that a SPAC merger was a potential avenue for Shift's capital raise, and that Stifel was not advising Shift regarding the SPAC. It was therefore incumbent on Stifel, as the primary drafter of the contract, to provide in the contract for any benefit that it would receive if Wells Fargo was successful

in advising Shift in a SPAC transaction.  Stifel's failure to do so does not result in a "windfall" for Shift -- instead, both parties are merely receiving the benefit of their bargain.

### E.  Attorney's Fees

Finally, Stifel claims that it is entitled to its attorney's fees under Section 5 of the Engagement Letter.  Section 5 is an indemnification provision, which provides in part that, "[i]n the event Stifel becomes involved in any capacity in any action, proceeding or investigation brought by or against any person in connection with any matter referred to in this Engagement Letter, [Shift] periodically will reimburse Stifel for its legal and other expenses . . . ."  Ex. B at 8.  But New York courts are "distinctly inhospitable" to claims that an indemnification provision provides for attorney's fees in a dispute between the parties and require "the intention to authorize an award of fees to the prevailing party in such circumstances [to] be virtually inescapable." Gotham Partners, L.P. v. High River Ltd. P'ship, 76 A.D.3d 203, 204, 209 (N.Y. 2010) (reversing award of attorney's fees because the contract did not meet the "exacting" requirement that "a contract provision employing the language of third-party claim indemnification may not be read broadly to encompass an award of attorney's fees to the prevailing party based on the other party's breach of the contract; the provision must explicitly so state"). The Engagement Letter does not explicitly provide for Shift to

reimburse Stifel for legal expenses in matters between the parties, and so Stifel's claim for attorney's fees fails.

## IV. Conclusion

For the reasons set forth above, defendant's motion to dismiss, ECF No. 22, is granted and the complaint is dismissed with prejudice.[4]  The Clerk of the Court is respectfully requested to close this case on the Court's docket.

**SO ORDERED.**

Dated:    New York, New York
          August 23, 2022

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[4]    At oral argument, plaintiff's counsel raised for the first time an argument about language in paragraphs 1 and 2 of the Engagement Letter and asked for leave to amend the complaint.  Plaintiff's last-ditch effort to assert a novel argument at oral argument is simply too little, too late.  It is too late in that this Court previously gave plaintiff the opportunity to amend, which plaintiff declined.  See ECF No. 19.  Moreover, it is "too little," because the argument fails.  Paragraphs 1 and 2 discuss the circumstances under which Shift can sell securities.  Ex. B at 3.  But because, as discussed above, the SPAC transaction cancelled all shares of Shift, no securities were transferred and therefore there was no sale.  As such, the Court denies leave to amend.